ACCEPTED
03-15-00728-CV
12671279
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/13/2016 1:41:56 PM
JEFFREY D. KYLE
CLERK

## No. 03-15-00728-CV

### IN THE THIRD COURT OF APPEALS
### AUSTIN, TEXAS

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/13/2016 1:41:56 PM
~~JEFFREY D. KYLE~~
Clerk

### WESTLAKE ETHYLENE PIPELINE CORPORATION,
*Appellant,*

**v.**

### RAILROAD COMMISSION OF TEXAS AND
### EASTMAN CHEMICAL COMPANY,
*Appellees.*

On Appeal from the 98th Judicial District Court
Travis County, Texas, Cause No. D-1-GN-15-001009

### EASTMAN CHEMICAL COMPANY'S ORAL ARGUMENT EXHIBITS

James E. Mann
State Bar No.12926100
jmann@dwmrlaw.com
Marnie McCormick
Leslie Padilla
DUGGINS WREN MANN &
ROMERO, LLP
600 Congress, Suite 1900
Austin, Texas 78701
Telephone: (512) 744-9300
Facsimile: (512) 744-9399

Wallace B. Jefferson
State Bar No. 00000019
wjefferson@adjtlaw.com
Dana Livingston
J. Woodfin Jones
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
515 Congress Avenue, Suite 2350
Austin, Texas 78701-3562
Telephone: (512) 482-9300
Facsimile: (512) 482-9303

# EXHIBIT A

Railroad Commission of Texas
Gas Services Division
License & Permits Section

Permit No. **05253**

## ORGANIZATION INFORMATION

| | |
|---|---|
| 1. Operator (Applicant) (See Instruction 1)<br>**Mustang Pipeline Company**  PS# 597145 | Address<br>PO Box 7444 Longview, Texas 75607 |

2. Does the above named operator own pipeline? ☐ Yes ☒ No If "No", give name and address of owner.

==Westlake Ethylene Pipeline Corporation==, 2801 Post Oak Blvd., Houston, Tx 77056

3. Does the above named operator conduct or control the economic operations on the pipeline? ☒ Yes ☐ No
If "No", give name, address and P-5# of economic operator. (See Instruction 2)

PS# _____

## PIPELINE INFORMATION

1. Mark appropriate block for each of the following questions:
   a) Are the pipelines covered under this permit ☐ Interstate ☒ Intrastate
   b) Fluid transported:
   ☐ Crude ☒ Condensate ☐ Gas (*) ☐ Products (*) ☐ Full Gas Well Stream ☐ Full Oil Well Stream ☐ Other (*)
   * Specify _____
   c) Does fluid contain $H_2S$? ☐ Yes ☒ No If yes, at what concentration? _____ ppm
   d) ==Pipeline classification:==
   If answer to (b) is other than natural gas, ==will the pipeline be operated as ☒ a common carrier or as ☐ a private line?==
   ==(Ch. 111, Texas Natural Resources Code)==
   If answer to (b) is natural gas, will the pipeline be operated as a ☐ gas utility or as a ☐ private line?
   (Texas Utilities Code)
   *NOTE: A natural gas pipeline permit will not specify whether the pipeline is a gas utility or a private line. The Gas Services Division Gas Utility Audit Section will make that determination and notify the operator of its status.*
   e) ==Does pipeline use any public highway or road, railroad, public utility, or other common carrier right-of-way?== ☒ Yes ☐ No
   f) Will the pipeline carry only the gas and/or liquids produced by pipeline owner or operator? ☐ Yes ☒ No
   If answer to (f) is "No", is the gas and/or liquids:
   ☐ Purchased from others. ☒ Owned by others, but transported for a fee. ☐ Both purchased and transported for others.

2. a) New installation? ☐ Yes ☒ No  New Construction Report Number _____
   b) Renewal for same operator? ☒ Yes ☐ No  (see 16 TAC 8.115 for applicability)
   c) Extension or modification? ☒ Yes ☐ No
   If there has been a change in operator or ownership, give name and address of previous operator, owner, or lessor (Attach form T4B)
   Previous owner; Mustang Pipeline Company, PO Box 7444 Longview, Tx., 75607 (Form T4B forthcoming by new Owner)

3. Check detailed purpose(s) for which described pipeline will be used:
   ☒ Transmission ☐ Terminal (Storage Field) ☐ Industrial Distribution
   ☐ Gathering ☐ Gas Lift ☐ Manufacturing Feed Stock (Own Consumption)
   ☐ Gas Injection ☐ Gas Plant ☐ Other (explain) Transport LPGs and initial use is ethylene

   **RECEIVED**
   **R.R.C. OF TEXAS**
   **JAN 08 2007**
   **GAS SERVICES DIVISION**
   **AUSTIN, TX**

4. U.S.G.S. 7.5 Minute Quad attached? (Scale 1" = 2,000 feet) ☐ Yes ☒ No
   Overview map (24" x 24" / 1" = 20 miles or less) attached and digital data sent? ☐ Yes ☒ No

I declare, under penalties prescribed in Sec. 91.143, Texas Natural Resources Code, that I am authorized to make this report, that this report was prepared by me or under my supervision and direction, and that data and facts stated therein are true, correct, and complete, to the best of my knowledge.

**Mr. James Ray**                                         JAN. 4, 2007
(Type or Print Name of Person)                           (Date)

**President, Mustang Pipeline Company**   *[signature: James Ray]*
(Title)
Inquiries regarding this application should be directed to:

Name: Curtis G. Brown   Address: PO Box 7444, Longview, Tx. 75607   Phone: (A/C) (903) 237-6606
Fax: (903) 237-5743   E-mail: cgbrown@eastman.com

The Railroad Commission does not discriminate on the basis of race, color, national origin, sex, religion, age, or disability in employment or the provision of services. TDD/TDY (512) 463-7284

**EXHIBIT B**

| 2002 MUSTANG TARIFF | 2013 WESTLAKE TARIFF |
|---|---|
| Origin/Delivery Point:  Carrier's station located at or adjacent to the terminals of Equistar Chemicals at Mont Belvieu, Texas, when such point of delivery/origin is practicable and consistent with the operation of the pipeline.  CR332. | Origin Points:  Carrier's stations located at or adjacent to the terminals of Equistar Chemicals, Williams Storage, and Flint Hills Resources at Mont Belvieu, Texas, when such points of origin are practicable and consistent with the operation of the pipeline, or such other points as the Carrier may designate and publish from time to time.  CR342. |
| Origin/Delivery Point:  Carrier's station in Gregg County [Longview], Texas, located adjacent to the Texas Operations Eastman Chemical Company/facility (in Gregg and Harrison Counties, Texas), when such point of delivery/origin is practicable and consistent with the operation of the pipeline. CR332. | Delivery Point:  Carrier's station in Gregg County [Longview], Texas, located adjacent to the Texas Operations Eastman Chemical Company facility (in Gregg and Harrison Counties, Texas), when such point of delivery is practicable and consistent with the operation of the pipeline, or such other points as the Carrier may designate and publish from time to time.  CR342. |

| 2002 MUSTANG TARIFF | 2013 WESTLAKE TARIFF |
|---|---|
| 17. Direction of Flow<br><br>In the event the pipeline is configured and equipped so that it is physically capable of bi-directional flow, Carrier at its sole discretion will choose the direction of flow between Point of Origin and Point of Delivery. Carrier will make a reasonable attempt to accommodate Shippers through the exchange of product at Origin and Delivery Points.  Any exchanges will be subject to the same terms and conditions applicable to shipments pursuant to this tariff, including the rate charged for such shipments.  The provisions of this tariff apply to all shipments or exchanges regardless of the direction of flow or whether the product shipped or received is physically moved from one point to another. CR338. | 17. Direction of Flow<br><br>In the event the pipeline is configured and equipped so that it is physically capable of bi-directional flow, Carrier at its sole discretion will choose the direction of flow between the Origin Point and the Destination Point. CR348. |

**EXHIBIT C**

# Excerpt from Exhibit A to Railroad Commission's Final Order

Westlake Ethylene Pipeline Corporation-T.R.R.C. No. _____
[Cancels Mustang Pipeline Company – Texas Local Tariff. -3]

WESTLAKE ETHYLENE PIPELINE CORPORATION
Mont Belvieu to Longview Pipeline

LOCAL TARIFF
Applying on

PETROLEUM PRODUCTS
As Defined in This Tariff

TRANSPORTED OR EXCHANGED BY PIPELINE
Between Points Within the State of Texas
Subject to the Regulations
Set Forth Herein

\* \* \* \*

Origin/Delivery Point: Carrier's stations located at or adjacent to the terminals of Equistar Chemicals, Williams Storage, and Flint Hills Resources at Mont Belvieu, Texas, when such points of origin are practicable and consistent with the operation of the pipeline, or such other points as the Carrier may designate and publish from time to time.

Origin/Delivery Point: Carrier's station in Gregg County, Texas, located adjacent to the Texas Operations Eastman Chemical Company facility (in Gregg and Harrison Counties, Texas), when such point of delivery is practicable and consistent with the operation of the pipeline, or such other points as the Carrier may designate and publish from time to time.

\* \* \* \*

17. Direction of Flow

In the event the pipeline is configured and equipped so that it is physically capable of bi-directional flow, Carrier at its sole discretion will choose the direction of flow between the Origin Point and Delivery Point. Carrier will make a reasonable attempt to accommodate Shippers through the exchange of product at Origin and Delivery Points. Any exchanges will be subject to the same terms and conditions applicable to shipments pursuant to this tariff, including the rate charged for such exchanges. The provisions of this tariff apply to all shipments or exchanges regardless of the direction of flow or whether the product shipped or received is physically moved from one point to another.

CR71, 73, 80.

**EXHIBIT D**

## BEFORE THE
## RAILROAD COMMISSION OF TEXAS

COMPLAINT FILED BY EASTMAN §
CHEMICAL COMPANY AGAINST §
WESTLAKE ETHYLENE CORP., § GAS UTILITIES DOCKET NO. 10296
(WESTLAKE PIPELINE) REGARDING §
WESTLAKE PIPELINE'S SYSTEM T-4 §
PERMIT NO. 05253 §

## FINAL ORDER

Notice of Open Meeting to consider this Order was duly posted with the Secretary of State within the time period provided by law pursuant to TEX. GOV'T CODE ANN. Chapter 551, *et seq.* (Vernon 2008 & Supp. 2014). The Railroad Commission of Texas adopts the following findings of fact and conclusions of law and orders as follows:

## FINDINGS OF FACT

1.  Westlake Ethylene Pipeline Corporation (Westlake Pipeline) operates a pipeline pursuant to T-4 Permit No. 05253.

2.  The pipeline that is subject to T-4 Permit No. 05253 runs from Mont Belvieu, Texas to Longview, Texas and traverses seven counties: Chambers, Liberty, Polk, Angelina, Nacogdoches, Rusk and Gregg, Counties.

3.  The pipeline is currently operated by Buckeye Development & Logistics I LLC (Buckeye) on behalf of Westlake Pipeline.

4.  On July 29, 2013, Eastman Chemical Company (Eastman) filed a complaint against Westlake Ethylene Pipeline Corporation (Westlake Pipeline) alleging that a tariff published and filed by Westlake Pipeline in 2013 (*2013 Westlake Pipeline Tariff*) was discriminatory.

5.  A notice of hearing on jurisdictional issues was issued on September 13, 2013, and a hearing on jurisdictional issues was held on September 27, 2013.

6.  A notice of hearing on the merits was issued on March 24, 2014. The notice of hearing bifurcated the hearing in this matter into two phases. Phase 1 addressed all discrimination and non-rate issues. All rate issues have been severed into Phase II.

7.  Phase II was severed into a separate proceedings docketed as GUD No. 10358, *Rate-Setting Proceeding Regarding Westlake Pipeline Severed from GUD No. 10296.*

8. On May 2, 2014, Westlake Pipeline filed an affidavit attesting that notice was served on the entity that operates the pipeline on behalf of Buckeye and all current customers of the pipeline that is the subject of this proceeding.

9. The hearing on Phase I, GUD No. 10296, was held on May 6, 2014.

10. Westlake Pipeline is subsidiary of Westlake Chemical Corporation (Westlake Chemical). Another Westlake Chemical subsidiary, Westlake Longview Corporation (Westlake Longview) is located in Longview.

11. The facilities of Westlake Longview are connected to ethylene supplies at Mt. Belvieu through Eastman's ethylene distribution system at Longview and the Westlake Ethylene Pipeline.

12. Westlake Longview consumes large quantities of ethylene in Longview.

13. Westlake Longview, or its ethylene supplier, is a shipper on the pipeline operated by Westlake Pipeline.

14. Eastman owns and operates ethylene producing facilities in Longview.

15. Eastman's Longview facility converts natural gas liquids (NGLs) feedstock, such as ethane and propane, to ethylene and propylene.

16. Eastman currently produces about 1,400 million pounds of ethylene annually from its crackers at Longview.

17. Eastman uses about 600 million pounds of ethylene annually at Longview, leaving about 800 million pounds of ethylene that must either be sold in Longview or transported to, or exchanged at, Mont Belvieu each year.

18. Other than Eastman's own use, the only substantial market for ethylene in Longview is Westlake Longview.

19. Eastman is a shipper on the pipeline operated by Westlake Pipeline.

20. In 1995, Eastman began planning a "common carrier" pipeline to provide ethylene to its Longview plant and construction began in December 1996.

21. Mustang Pipeline Company (Mustang), an Eastman subsidiary, started construction on the pipeline.

22. In 2002, Eastman constructed the "Williams Connection."

23. The Williams Connection connected Eastman's Mont Belvieu terminal to contracted storage owned by the Williams Company, the first fungible ethylene storage facility in

Mont Belvieu, and added the compression necessary to ship ethylene south to Mont Belvieu.

24.     At the time of the construction of the Williams Connection, Eastman sought the ability to sell surplus ethylene produced in Longview and allow Eastman to maintain ethylene production when ethylene-consuming facilities were down in Longview.

25.     In 1997, Mustang Pipeline issued the original tariff for the pipeline (*1997 Mustang Tariff*).

26.     The *1997 Mustang Tariff* identified the "origin point" as Mont Belvieu and the "delivery point" as Longview.

27.     The *1997 Mustang Tariff* did not include provisions for the exchange of ethylene.

28.     In 2002, after adding compression necessary to deliver ethylene from Longview to Mont Belvieu, Mustang Pipeline issued a revised tariff (*2002 Mustang Tariff*).

29.     The *2002 Mustang Tariff* identified Mont Belvieu as both an origin and delivery point.

30.     The *2002 Mustang Tariff* identified Longview as both an origin and delivery point.

31.     The *2002 Mustang Tariff* also indicated that Mustang, the operator of the pipeline, would, in addition to physical deliveries of ethylene, offer exchange services.

32.     On November 10, 2006, Eastman and Westlake Chemical entered into an acquisition agreement.

33.     As part of the sales agreement the Mustang pipeline assets were transferred to Westlake Pipeline.

34.     As part of the acquisition agreement certain ethylene-consuming facilities owned by Eastman were sold to Westlake Longview.

35.     The purchase agreement between Mustang Pipeline and Westlake Pipeline included the sale of the pipeline conduit.

36.     Westlake Pipeline's ownership of the pipeline at the southern end begins just outside the two meters belonging to Equistar and Williams and a check meter and pipeline belonging to Eastman. The pipeline extends from that ownership point at Mont Belvieu to a point that connects the Eastman plant to distribution facilities in Longview. The pipelines' connection at Longview is on property that is owned by Eastman.

37.     The pipeline purchase agreement also included all right of ways, easements, privileges and grants upon and under which the pipeline system was laid and installed.

38.  Westlake Pipeline did not acquire any terminals in the sale, the pipeline terminals, nor any of the compression necessary to operate the pipeline.

39.  The overall sales agreement between Eastman and Westlake Chemical included the acquisition, by Westlake Longview, of three polyethylene units that are located within the Eastman's plant in Longview.

40.  As part of the overall sale, on November 10, 2006, Eastman Chemical and Westlake Chemical Corporation entered into the Ethylene Sales and Exchanges Contract (ESA).

41.  The ESA is a ninety-nine year ethylene contract that sets a market price using a pre-determined formula agreed to by both parties in the contract.

42.  Pursuant to the ESA, Eastman Chemical secured a guaranteed market for ethylene, and Westlake Longview Corporation secured an ethylene supplier.

43.  The ESA also provided Eastman with the ability to exchange any excess ethylene that Westlake Longview did not purchase from Eastman.

44.  In 2013, Westlake Pipeline published and filed a new tariff for the pipeline (*2013 Westlake Tariff*).

45.  Pursuant to the *2013 Westlake Pipeline Tariff*, Mont Belvieu was no longer designated as both an origin and delivery point. Mont Belvieu was designated as an origin point.

46.  Pursuant to the *2013 Westlake Pipeline Tariff*, Longview was no longer designated as both an origin and delivery point. Longview was designated as a delivery point.

47.  The *2013 Westlake Pipeline Tariff* removed all references to ethylene exchange as Westlake Pipeline determined that exchange services would no longer be offered.

48.  Mont Belvieu is the largest market for ethylene producers in the United States.

49.  Pipeline transport is among the most important factors that determine regional prices, supply, and demand.

50.  It is reasonable to conclude that the ethylene producers in Longview would require access to the ethylene market in Mont Belvieu.

51.  It is reasonable to conclude that ethylene consumers that engage in transactions in Mont Belvieu would desire access to ethylene produced in Longview

52.  Eastman produces large quantities of ethylene in Longview and has a physical necessity to move ethylene to Mont Belvieu.

53. Ethylene was transported from Longview to Mont Belvieu on several occasions in the following years: 2005, 2006, 2007, 2008, and 2013.

54. The necessity for southbound flow predates the purchase of the system by Westlake Pipeline. It is the reason that compression was added in 2002 to allow backhaul and to permit Eastman to sell surplus ethylene that it produced in Longview to customers on the Gulf Coast.

55. Eastman has demonstrated a demand for exchanges as Eastman has engaged in exchanges with Westlake Pipeline's affiliate, Westlake Longview since entering into the ESA.

56. Backhaul service is physically possible on the pipeline operated by Westlake Pipeline.

57. The pipeline system was configured in 2002 to accept bidirectional flow.

58. Backhaul on the pipeline occurred in 2005, 2006, 2007, 2008, and 2013.

59. The *2013 Westlake Pipeline Tariff* removed the backhaul service previously offered in the *2002 Mustang Tariff*.

60. The record in this case does not provide evidence of the impediment to the continued provisions of backhaul service.

61. Any concern that this operator lacks the compression necessary to provide backhaul service is addressed by the language in the preexisting *2002 Mustang Tariff*, which requires shippers to deliver and receive product at the necessary pressures.

62. Additional language may be added to further protect the common carrier;

> The paragraph means that a shipper is responsible for providing or arranging sufficient compression or services to effectuate the entry of the product into the pipeline at an Origin Point and delivery of the product out of the Pipeline at a Delivery Point.

63. There is no impediment for a pipeline to provide exchange service and the risks associated with that service may be mitigated by appropriate language in the tariff.

64. The *2002 Mustang Tariff* contained language that protected the pipeline operator and is included in the *2013 Westlake Pipeline Tariff*. Additional language may be added to protect the operator as follows:

> Carrier is not obligated to transport or exchange any volumes of ethylene unless Shipper delivers those volumes to the common stream out of which deliveries are made to Pipeline Customers.

65. Due to the unique circumstances of the ethylene market in Longview, without an exchange provision in the applicable pipeline tariff the only alternative for Eastman is to engage in exchanges with Westlake Longview, the pipeline operator's affiliate.

66. If exchange service is included in the applicable pipeline tariff Eastman may engage in exchanges with market participates in Mont Belvieu and will no longer be a captive to Westlake Longview.

67. Eastman, Westlake Longview, and Westlake Longview's ethylene suppliers (other than Eastman), are potential shippers on the pipeline operated by Westlake Pipeline.

68. Eastman and Westlake Longview are located in Longview.

69. Eastman and Westlake Longview each require movement of ethylene between Mont Belvieu and Longview.

70. Eastman and Westlake Longview require access to the ethylene market in Mont Belvieu and the ethylene market in Longview.

71. The only difference is that Eastman requires deliveries from Longview to Mont Belvieu and Westlake Longview requires deliveries from Mont Belvieu to Longview.

72. Eastman and Westlake Longview, or its other potential suppliers of ethylene, are similarly-situated shippers.

73. The tariff changes in the *2013 Westlake Pipeline Tariff* related to backhaul eliminated a service that was previously provided to Eastman on this pipeline.

74. The tariff changes in the *2013 Westlake Pipeline Tariff* related to backhaul physically shut Eastman out of the pipeline.

75. Longview is no longer designated as an "Origin Point" and Mont Belvieu is no longer designated as a "Delivery Point."

76. Due to the operation of the filed tariff Eastman would no longer be able to demand backhaul service

77. Due to the operation of the filed tariff, Westlake Pipeline would be unable to treat those points as Origin and Delivery points.

78. Westlake Longview will continue to have access to the pipeline and the Mont Belvieu ethylene market.

79. Eastman would be shut out of the Mont Belvieu market by the changes in the *2013 Westlake Pipeline Tariff*.

80. Westlake Pipeline has offered no reasonable basis for the disparate treatment as regards to physical deliveries on the pipeline.

81. The tariff change in the *2013 Westlake Pipeline Tariff* related to exchanges eliminates a pre-existing service offered by the pipeline operator.

82. Once that service is eliminated, Eastman must engage in exchanges with Westlake Longview, an affiliate of the pipeline operator.

83. The removal of exchange service further limits Eastman's access to the Mont Belvieu market through the pipeline.

84. The elimination of backhaul and exchanges, pre-existing service offered by the common carriers of this pipeline, provides an unreasonable preference in favor of Westlake Longview.

85. Whether discrimination by a common carrier exists depends on the facts of a particular case. The discriminatory act found to have occurred in this docket is the cancellation of pre-existing backhaul and exchange services so that one shipper, Eastman Chemical, is forced to sell or exchange the ethylene it produces to the only other shipper on the pipeline, Westlake Longview, the parent company of the pipeline.

## CONCLUSIONS OF LAW

1. Westlake Pipeline is a "common carrier" as that term is defined under TEX. NAT. RES. CODE ANN. § 111.020(d) (Vernon 2001 & Supp. 2014) and is therefore subject to the jurisdiction of the Railroad Commission of Texas (Commission).

2. As a common carrier Westlake Pipeline is subject to all provisions of the Common Carrier Act, TEX. NAT. RES. CODE ANN. §§ 111.002, 111.003, 111.011 – 111.025, 111.131, 111.133 – 111.142, 111.181 – 111.190, 111.221 – 111.227, & 111.261 – 111.262.

3. In addition to the powers provided by other sections of Chapter 2, Subchapter B of the Business Organization Act, TEX. BUSINESS CORP. ACT ANN. § 2.105 provides that a corporation, such as Westlake Pipeline engaged as a common carrier in the pipeline business for the purpose of transporting oil products has all of the rights and powers conferred on a common carrier by Sections 111.019 – 111.022.

4. The Commission has jurisdiction over Westlake Pipeline, associated affiliates, and the matters at issue in this proceeding pursuant to *TEX. NAT. RES. CODE ANN.* §§ 81.051 and §§ 111.002, 111.003, 111.011 – 111.025, 111.131, 111.133 – 111.142, 111.181 – 111.190, 111.221 – 111.227, & 111.261 – 111.262.

5. As required by *TEX. NAT. RES. CODE ANN.* § 111.014 Westlake Pipeline shall make and publish their tariffs.

6.    A common carrier's obligations to its customers cannot exceed its duties under a published tariff and published tariffs govern the relationship of the common carrier with its customers. Common carriers may not vary a tariff's terms with individual customers, discriminate in providing services, or charge rates other than those included in properly published tariffs. The published tariffs and the constraints related to those tariffs provide predictability and certainty for all potential shippers and enable shippers to make decisions based upon the rates and services reflected in the published tariff. *CenterPoint Energy Entex v. R.R. Commn'n of Tex*, 208 S.W. 3rd 608 (Tex. – Austin 2006, pet. dism'd)

7.    Westlake Pipeline, as a common carrier, is required to receive and transport ethylene delivered to it for transportation and perform its other related duties without discrimination as required by *Tex. Nat. Res. Code Ann.* § 111.015.

8.    Westlake Pipeline, as a common carrier, shall not discriminate between or against shippers with regard to facilities furnished, services rendered, or rates charged under the same or similar circumstance in the transportation of ethylene as required by *Tex. Nat. Res. Code Ann.* § 111.015.

9.    Westlake Pipeline, as a common carrier, may not charge, demand, collect, or receive either directly or indirectly from anyone a greater or lesser compensation for a service rendered than from another for a like and contemporaneous service.

10.   Westlake Pipeline's 2013 tariff terminated pre-existing backhaul and exchange services and provided an unreasonable preference and advantage to its affiliate, Westlake Longview.

11.   The Commission has the authority to require that tariffs published by a common carrier and filed with the Commission are not discriminatory.

12.   Tariffs that provide disparate treatment to similarly-situated shippers or provide an unreasonable preference or advantage to an affiliate at the expense of other shippers are discriminatory.

13.   There is no general duty for a common carrier to provide backhaul and exchange services. Neither is there a general duty to maintain services previously offered by a common carrier. It is discriminatory, however, for a common carrier to cancel previously existing services and cut off access to a market so that all other shippers on the pipeline are forced to sell or exchange their product with a shipper on that same pipeline which is affiliated with the pipeline.

**IT IS THEREFORE ORDERED** that the *2013 Westlake Pipeline Tariff* is rejected and may not be enforced by Westlake Pipeline.

**IT IS FURTHER ORDERED** that Westlake Pipeline publish and file with the Commission a revised tariff that is not discriminatory and conforms to the tariff attached to this Final Order as Exhibit A.

**IT IS FURTHER ORDERED** that, in accordance with TEX. NAT. RESOURCE CODE ANN. § 111.015, within 30 days of the date this Order is signed, Westlake Pipeline shall file the approved tariff with the Director of the Oil and Gas Division. The tariffs shall reflect the findings of fact and conclusions of law herein.

**IT IS FURTHER ORDERED** that all proposed findings of fact and conclusions of law not specifically adopted in this Order are hereby **DENIED**.

**IT IS ALSO ORDERED** that all pending motions and requests for relief not previously granted or granted herein are hereby **DENIED**.

This Order will not be final and effective until 20 days after a party is notified of the Commission's order. A party is presumed to have been notified of the Commission's order three days after the date on which the notice is actually mailed. If a timely motion for rehearing is filed by any party at interest, this order shall not become final and effective until such motion is overruled, or if such motion is granted, this order shall be subject to further action by the Commission. Pursuant to TEX. GOV'T CODE ANN. § 2001.146(e), the time allotted for Commission action on a motion for rehearing in this case prior to its being overruled by operation of law, is hereby extended until 90 days from the date the order is served on the parties.

SIGNED this 9th day of December 2014.

RAILROAD COMMISSION OF TEXAS

_Christi Craddick_
CHAIRMAN CHRISTI CRADDICK

_David Porter_
COMMISSIONER DAVID PORTER

_____
COMMISSIONER BARRY T. SMITHERMAN

ATTEST:

_Kate Kaut_
SECRETARY

**CERTIFICATE OF SERVICE**

On September 13, 2016, I electronically filed the oral argument exhibits with

the Clerk of the Court using the eFile.TXCourts.gov electronic filing system which

will send notification of such filing to the following.

Lindsay Hagans
State Bar No. 24087651
lindsay.hagans@bracewelllaw.com
BRACEWELL LLP
711 Louisiana Street, Suite 2300
Houston, Texas 77002
Telephone: (713) 223-2300
Facsimile:  (800) 404 3970

Prerak Shah
State Bar No. 24075053
prerak.shah@texasattorneygeneral.gov
Lisa Bennett
State Bar No. 24073910
lisa.bennett@texasattorneygeneral.gov
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Telephone  (512) 936-2923
Facsimile:  (512) 474-2697

*Counsel for Appellee*
*Texas Railroad Commission*

Dale Wainwright
State Bar No. 00000049
dale.wainwright@bracewelllaw.com
BRACEWELL LLP
111 Congress Avenue, Suite 2300
Austin, Texas 78701
Telephone: (512) 472-7800
Facsimile:  (800) 404-3970

*Counsel for Appellant*
*Westlake Ethylene Pipeline Corp.*

/s/ Dana Livingston
Dana Livingston